IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON

**UNITED STATES OF AMERICA**

**v.**                                          **CRIMINAL NO. 2:24-cr-00050**

**CURON CAMERON CORDON**

### SENTENCING MEMORANDUM OF THE UNITED STATES

COMES NOW the United States of America, by Lesley Shamblin, Assistant United States Attorney for the Southern District of West Virginia, and pursuant to this Court's order entered on August 1, 2024 (ECF No. 31), hereby files this memorandum in aid of sentencing in the above-styled case. For the reasons explained herein, the United States respectfully requests that this Court impose an upward-variant sentence of 36 months of imprisonment.

I. **BACKGROUND**

On August 1, 2024, Curon Cameron Cordon ("Defendant"), pursuant to a written plea agreement, pled guilty to Count Three of the Indictment in this case, which charged him with distribution of protonitazene and isotonitazene, both Schedule I controlled substances, in violation of 21 U.S.C. § 841(a)(1). (ECF Nos. 1, 27, 28, 29.) The Presentence Investigation Report ("PSR") prepared by the United States Probation Office for the Southern District of

West Virginia calculated Defendant's total offense level at fifteen and his criminal history category at II, resulting in a Guidelines range of 21-27 months of imprisonment. (PSR ¶¶ 47, 54, 74.) The United States agrees with this calculation.

## II. <u>OUTSTANDING OBJECTIONS TO PSR</u>

The United States anticipates that, as outlined in the Addendum to the PSR, Defendant will contest the PSR's inclusion of the ninety-four pills found during the execution of a search warrant at the residence of Jesus Emmanuel Davis ("Davis") on June 8, 2023, as relevant conduct attributable to Defendant, as well as the PSR's application of the two-level firearm enhancement. (PSR ¶¶ 20, 24, 39; Addendum). Defendant's objections should be overruled.

### (1) <u>Relevant Conduct</u>

The PSR correctly included the pills found in Davis's bedroom in the calculation of Defendant's base offense level. For sentencing purposes, a defendant involved in "a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy)" is accountable for "all acts and omissions of others that were[] (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in

2

connection with that criminal activity." U.S.S.G. §1B1.3(a)(1)(B); id. §1B1.3(a)(2). To that end, "before . . . drugs seized from a co-conspirator may be attributed to a defendant at sentencing, a district court must make 'particularized findings' as to the scope of the defendant's agreement to jointly undertake criminal activity as well as to foreseeability." United States v. Evans, 90 F.4th 257, 263 (4th Cir. 2024) (emphasis deleted).

Defendant and Davis were engaged in a jointly undertaken criminal activity to sell pills to the confidential informant ("CI") in this case. Although Defendant characterizes himself as a mere customer of Davis's, their relationship was different from that of the dealer and his supplier in the average drug case. Defendant orchestrated six transactions with the CI that involved the sale of pills from Davis's stash. On April 7, 2023, during the first controlled buy that was part of the investigation that led to this case, Defendant agreed to sell pills to the CI but then sent Davis to the deal in his place. That is not something that suppliers generally do for their dealer customers. Then, during the controlled buys on May 11, 17, 24, and 31, 2023, Defendant drove the CI to Davis's house to get the pills he sold to the CI. Clearly, Defendant did not have his own stash of pills to sell to the CI and was instead selling directly from Davis's stash. That Davis would continue to have a stash of pills in his house for

3

Defendant to sell from was within the scope of their agreement to sell the pills to the CI, in furtherance of that agreement, and reasonably foreseeable to Defendant.

Defendant's attempts to compare himself to hypothetical defendants in the Guidelines commentary are unavailing. His relationship with Davis is nothing like the relationship between street-level dealers who share the same supplier but do not work with each other. Rather, Defendant and Davis <u>both</u> sold drugs to the CI in this case, and Davis was the source of those drugs. Defendant is also unlike a dealer who knows his supplier is importing large quantities of drugs but agrees to distribute only a fraction of those drugs. The dealer in that scenario is akin to the defendant in <u>United States v. Flores-Alvarado</u>, whom the Fourth Circuit determined was not accountable for drugs seized from his supplier because aside from a single shipment that predated the seizure, there was no evidence that the defendant and his supplier "jointly agreed to operate together for future drug deals." 779 F.3d 250, 256-57 (4th Cir. 2015). By contrast, Defendant took the CI to Davis's house to get drugs every few days for three weeks in a row. Defendant did not -- as he did during the controlled buys on April 13 and 20, 2023, and May 3, 2023 -- sell the CI drugs from a stash he had already purchased. Put simply, getting the drugs from Davis to sell to the CI was part of Defendant's plan.

He did not need to buy pills ahead of time because he knew Davis would have them for him when he needed them.

In that way, Defendant is comparable to the defendants in United States v. Oiler, 282 F. App'x 285 (4th Cir. 2008) (per curiam), and United States v. Kasprowski, 105 F.3d 649 (4th Cir. 1996) (per curiam) (table), 1996 WL 742390. The defendants in Oiler were family members who pled guilty to conspiracy to distribute crack cocaine. 282 F. App'x at 286. The district court found that the drugs purchased by the male defendant from his supplier were relevant conduct attributable to the female defendant because the female defendant "obtained drugs on a regular basis from [the male defendant] for distribution" and "was familiar with [the male defendant's] supplier." Id. The Fourth Circuit affirmed. Id. Similarly, the defendant in Kasprowski lived with her boyfriend, who was the target of a drug investigation. 1996 WL 742390, at *1. On one occasion, a CI came to their apartment to buy drugs from the defendant's boyfriend, but only the defendant was home. Id. The defendant went ahead with the transaction in her boyfriend's absence and told the CI that she counted the money from her boyfriend's drug sales. Id. On two other occasions after that, the CI bought drugs from the defendant's boyfriend while the defendant was present, although she did not participate in the transactions herself. Id. The district court found that the drugs sold during

the latter two transactions were relevant conduct attributable to the defendant. Id. at *2. The Fourth Circuit affirmed, holding that the district court's ruling was supported by the defendant's "direct involvement in" and "complicity in" her boyfriend's drug sales. Id. at *3.

Like the female defendant in Oiler, Defendant was related to his supplier (i.e., Davis) and regularly obtained pills from him. And like the defendant in Kasprowski, Defendant partnered with Davis to sell pills to the CI. Their agreement is apparent from the fact that Davis conducted the first transaction with the CI at Defendant's direction and in his place and from the fact that four of the remaining seven controlled buys involved pills that Defendant obtained from Davis's house during the buys themselves. Again, that Davis would continue to have pills at his house was within the scope of the agreement between Defendant and Davis to sell the pills, in furtherance of that agreement, and reasonably foreseeable to Defendant given the agreement. Therefore, the ninety-four pills found in Davis's house on June 8, 2023, are attributable to Defendant as relevant conduct.

### (2) **Firearm Enhancement**

The PSR correctly applied the firearm enhancement when calculating Defendant's offense level. When a defendant is convicted of a drug distribution offense, the Guidelines provide

6

for a two-level increase "[i]f a dangerous weapon (including a firearm) was possessed." U.S.S.G. §2D1.1(b)(1). The enhancement "should be applied if the weapon was present" during the commission of the offense, "unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. §2D1.1 cmt. n.11(A). The requisite connection between the weapon and the defendant's conduct exists if there is "a temporal and spatial relation linking the weapon, the drug trafficking activity, and the defendant." United States v. Bolton, 858 F.3d 905, 912 (4th Cir. 2017) (internal quotation marks omitted).

Defendant sold both drugs and guns during five of the eight controlled buys in this case, including during the offense of conviction. In United States v. Lipford, the Fourth Circuit held that such conduct satisfies the elements of 18 U.S.C. § 924(c), explaining that "the firearm facilitates the drug transaction" by "making it possible for the drug buyer to get the drug seller to take the risks inherent in selling contraband." 203 F.3d 259, 267 (4th Cir. 2000). Relying on that reasoning, in United States v. Bokman, the Fourth Circuit held that the district court properly applied the firearm enhancement to a defendant who sold drugs and guns together. 215 F. App'x 203, 205-06 (4th Cir. 2007) (per curiam). Defendant's conduct is materially indistinguishable from

7

that of the defendant in Bokman. Thus, the firearm enhancement applies to Defendant.

**III. 18 U.S.C. § 3553(a) SENTENCING FACTORS**

In assessing the 18 U.S.C. § 3553(a) sentencing factors, the United States respectfully requests that this Court consider the following:

**(1) Nature and Circumstances of the Offense.**

In April 2023, officers with the Charleston, West Virginia, Police Department ("CPD") began investigating Defendant for selling what he claimed were fentanyl pills. (PSR ¶ 7.) Between April 7, 2023, and May 31, 2023, officers with CPD and the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") conducted a total of eight controlled purchases of suspected fentanyl pills (and, during five of those controlled purchases, guns in addition to pills) from Defendant using a CI. (PSR ¶¶ 8, 18.) The pills Defendant sold to the CI were counterfeit pressed pills with the same markings as 30mg oxycodone pills. (See PSR ¶¶ 8, 10, 17.) The pills were lab-tested after being seized and determined to contain not fentanyl or oxycodone but protonitazene and isotonitazene, both Schedule I synthetic opioids more potent than fentanyl. (PSR ¶¶ 18, 33.)

The May 31, 2023 controlled buy to which Defendant has pled guilty is typical of most of the controlled buys conducted during

8

the investigation that led to this case. During the controlled buys, the CI would usually meet Defendant at his family's restaurant. (PSR ¶ 14.) When the CI arrived at the restaurant, Defendant and the CI -- and sometimes Defendant's girlfriend -- would get into a vehicle, where Defendant would typically give the CI the gun(s) he had agreed to sell to the CI. (PSR ¶ 15.) Defendant would then drive the CI to Davis's residence, go inside alone, and return to the car with pills for the CI. (PSR ¶ 16.) On one occasion -- the first controlled buy, which took place on April 7, 2023 -- Defendant arranged to sell pills to the CI but sent Davis to meet the CI in his place. (PSR ¶¶ 9-10.)

Based on the controlled purchases, law enforcement obtained a search warrant for Davis's residence, which was executed on June 8, 2023. (PSR ¶ 19.) During the search, law enforcement found nearly 100 of the same pills bought during the controlled buys in the pocket of a jacket hanging in Davis's bedroom closet. (PSR ¶ 20.) Davis later claimed ownership of the pills in a recorded statement. (PSR ¶ 13.)

Defendant obtained the majority of the guns he sold to the CI by recruiting Kayla Brooke McCallister ("McCallister") to straw purchase them for him. (PSR ¶¶ 22-23.) He did so because he knew McCallister was addicted to drugs and needed money. (PSR ¶ 23.) He paid her between $150 and $300 each time she bought guns for him,

9

and she bought a total of ten guns in April and May 2023. (PSR ¶¶ 22-23.) Defendant would sell those guns to the CI within days -- and once, on the same day -- after McCallister bought them. (Compare PSR ¶ 22 with PSR ¶ 18.) Half of the guns McCallister purchased were not recovered by law enforcement. (PSR ¶ 22 n.1.)

**(2) <u>History and Characteristics of the Offender.</u>**

Defendant is twenty-four years old. (PSR ¶ 59.) He was born in Harlem, New York, and lived there until the sixth grade, when his family moved to Charleston, West Virginia. (PSR ¶ 64.) He has a close relationship with his family and is particularly close to Davis, who is Defendant's cousin. (PSR ¶ 62.) Defendant was involved in sports growing up, and his parents encouraged his education. (PSR ¶ 62.) After graduating from high school, Defendant attended college. (PSR ¶¶ 68-69.)

Defendant's parents own two businesses, a restaurant and a moving service, and Defendant has worked for both of them. (PSR ¶ 71.) Defendant has also worked at other restaurants and a gas station, and when he was arrested on the indictment in this case, he was a delivery driver for DoorDash and Instacart. (PSR ¶ 71.)

In February 2021, when he was twenty years old, Defendant pled guilty to simple possession of a controlled substance and unlawful possession of a firearm by a prohibited person. (PSR ¶ 51.) He was assessed a fine and court costs and paid them. (PSR

¶ 51.) In October 2021, he pled guilty to driving on a suspended license and driving without insurance as a result of an automobile accident. (PSR ¶ 50.) At the time of the accident, law enforcement found eight grams of marijuana in his pants pocket and a gun in a backpack that was at his feet. (PSR ¶ 50.) Earlier this year, Defendant pled guilty to embezzlement after he stole gift cards and product from a gas station where he worked. (PSR ¶ 52.) He was assessed a fine, court costs, and $500 in restitution. (PSR ¶ 52.)

- **(3) Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, Provide Adequate Deterrence, and Protect the Public.**

Defendant has pled guilty to a serious offense made all the more serious by the nature of the drugs he distributed. Defendant was selling counterfeit pressed pills, with coloration and markings intended to make them look like legitimate pharmaceuticals. Although the pills were marketed as fentanyl pills, they actually contained protonitazene and isotonitazene -- two synthetic opioids with effects on the human body similar to those of fentanyl but with a significantly higher potency. That high potency results in an increased risk of overdose and death. The substances in the pills Defendant sold are so new to the illicit drug trade in this District and in the United States that the law enforcement officers involved in this investigation -- who regularly work drug cases -- had never encountered them before. In

11

reality, Defendant had no idea what he was selling and no regard for what it would do to the people he sold it to. Defendant did not use the pills himself and sold drugs solely for financial gain.

Defendant sold guns with the drugs and was willing to do so even though the CI (falsely) told him that the CI was a convicted felon. Defendant told the CI that he was more involved in selling guns than in selling drugs and asked the CI if the CI knew anyone who could straw purchase guns for him. Defendant took advantage of McCallister's drug addiction and financial difficulties by targeting her to straw purchase guns for him. In total, she purchased ten guns. Defendant ended up selling five of those guns to the CI shortly after McCallister bought them. The other five guns were not recovered at McCallister's house or at Defendant's apartment and have yet to be seized by law enforcement. The most logical explanation for what happened to them is that Defendant sold them to other people.

A sentence within the Guidelines range of 21-27 months of imprisonment would be insufficient to capture the full scope of Defendant's conduct. Although the Guidelines account for Defendant selling pills containing dangerous substances and selling guns along with those pills, they do not reflect that Defendant sold guns to a CI who was purportedly a convicted felon, recruited a drug addict to straw purchase ten guns for him to sell, and exposed

12

his longtime girlfriend -- who will soon give birth to his child -- to criminal liability by involving her in his dealings with the CI. Defendant's criminal history, while relatively short, further illustrates his willingness to possess drugs and guns together and shows that prior arrests for that conduct did not deter him from repeating his behavior. In fact, Defendant had a gun and a distribution quantity of marijuana when he was arrested on the indictment in this case.

An upward-variant sentence of 36 months of imprisonment would more adequately represent the seriousness of Defendant's conduct and the immense danger it posed to the public. Such a sentence would also be sufficient but not greater than necessary to punish Defendant for his actions, to promote respect for the law, and to deter him and others from engaging in similar conduct in the future.

**(4) <u>Available Sentences and Applicable Guidelines Range.</u>**

The statutory maximum term of imprisonment is twenty years, with no applicable mandatory minimum. If this Court agrees with the total offense level and criminal history category calculations in the PSR, Defendant's Guidelines range is 21-27 months of imprisonment.

**(5) Restitution.**

There is no identifiable victim entitled to restitution in this case. The United States does not intend to seek community restitution due to Defendant's limited financial resources.

IV. **WITNESSES & TIME FOR HEARING**

The United States does not anticipate calling any witnesses during the sentencing hearing. The United States believes the sentencing hearing will last no longer than one hour.

V. **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that this Court impose an upward-variant sentence of 36 months of imprisonment.

Respectfully submitted,

WILLIAM S. THOMPSON
United States Attorney

/s/Lesley Shamblin
LESLEY SHAMBLIN
Assistant United States Attorney
WV Bar No. 12975
300 Virginia Street, East
Room 4000
Charleston, WV 25301
Telephone: 304-345-2200
Fax: 304-347-5104
Email: Lesley.Shamblin@usdoj.gov

## CERTIFICATE OF SERVICE

It is hereby certified that the foregoing "SENTENCING MEMORANDUM OF THE UNITED STATES" has been electronically filed and service has been made on opposing counsel by virtue of such electronic filing and by email this 24th day of October, 2024, to:

>Gordon L. Mowen, II
>Orndorff Mowen PLLC
>135 Corporate Centre Drive, Suite 254
>Scott Depot, WV 25560
>Email: Gordon.Mowen@om-pllc.com

>/s/Lesley Shamblin
>LESLEY SHAMBLIN
>Assistant United States Attorney
>WV Bar No. 12975
>300 Virginia Street, East
>Room 4000
>Charleston, WV 25301
>Telephone: 304-345-2200
>Fax: 304-347-5104
>Email: Lesley.Shamblin@usdoj.gov